**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| **UNITED STATES OF AMERICA** | CASE NO. ___24-CR-623 (CCC)___ |
| **v.** | |
| **TD SECURITIES (USA) LLC,** | |
| **Defendant.** | |

_____ /

**DEFERRED PROSECUTION AGREEMENT**

Defendant TD Securities (USA) LLC (the "Company"), pursuant to authority granted by the Company's Board of Directors reflected in Attachment B, and the United States Department of Justice, Criminal Division, Fraud Section (the "Fraud Section"), enter into this deferred prosecution agreement (the "Agreement"). TD Group US Holdings LLC ("TDGUS"), which is not a defendant in this matter, also agrees, pursuant to the authority granted by TDGUS's Board of Directors, to certain terms and obligations of the Agreement as described below. The terms and conditions of this Agreement are as follows:

**Criminal Information and Acceptance of Responsibility**

1.      The Company acknowledges and agrees that the Fraud Section will file the attached one-count criminal Information in the United States District Court for the District of New Jersey charging the Company with wire fraud, in violation of 18 U.S.C. § 1343, as well as a criminal forfeiture allegation. In so doing, the Company: (a) knowingly waives any right it may have to indictment on this charge, as well as all rights to a speedy trial pursuant to the Sixth Amendment

1

to the United States Constitution, Title 18, United States Code, Section 3161, and Federal Rule of Criminal Procedure 48(b);  (b) knowingly waives any objection with respect to venue to any charges by the United States arising out of the conduct described in the Statement of Facts attached hereto as Attachment A ("Statement of Facts") and consents to the filing of the Information, as provided under the terms of this Agreement, in the United States District Court for the District of New Jersey; and (c) agrees that the charges in the Information and any charges arising from the conduct described in the Statement of Facts are not time-barred by the applicable statute of limitations on the date of the signing of this Agreement.  The Fraud Section agrees to defer prosecution of the Company pursuant to the terms and conditions described below.

2.      The Company admits, accepts, and acknowledges that it is responsible under United States law for the acts of its officers, directors, employees, and agents as charged in the Information, and as set forth in the Statement of Facts, and that the allegations described in the Information and the facts described in the Statement of Facts are true and accurate.  The Company agrees that, effective as of the date the Company signs this Agreement, in any prosecution that is deferred by this Agreement, it will not dispute the Statement of Facts set forth in this Agreement, and, in any such prosecution, the Statement of Facts shall be admissible as: (a) substantive evidence offered by the government in its case-in-chief and rebuttal case; (b) impeachment evidence offered by the government on cross-examination; and (c) evidence at any sentencing hearing or other hearing.  In addition, in connection therewith, the Company agrees not to assert any claim under the United States Constitution, Rule 410 of the Federal Rules of Evidence, Rule 11(f) of the Federal Rules of Criminal Procedure, Section 1B1.1(a) of the United States Sentencing

Guidelines, or any other federal rule that the Statement of Facts should be suppressed or is otherwise inadmissible as evidence in any form.

## Term of the Agreement

3.      This Agreement is effective for a period beginning on the date on which the Information is filed and ending three years from that date (the "Term").  The Company and TDGUS agree, however, that, in the event the Fraud Section determines, in its sole discretion, that the Company or TDGUS has knowingly violated any provision of this Agreement or has failed to completely perform or fulfill each of the Company's or TDGUS's obligations under this Agreement, an extension or extensions of the Term may be imposed by the Fraud Section, in its sole discretion, for up to a total additional time period of one year, without prejudice to the Fraud Section's right to proceed as provided in Paragraphs 23 through 27 below.  Any extension of the Agreement extends all terms of this Agreement, including the terms of the reporting requirement in Attachment D, for an equivalent period.  Conversely, in the event the Fraud Section finds, in its sole discretion, that there exists a change in circumstances sufficient to eliminate the need for the reporting requirement in Attachment D, and that the other provisions of this Agreement have been satisfied, the Agreement may be terminated early.

## Relevant Considerations

4.      The Fraud Section enters into this Agreement based on the individual facts and circumstances presented by this case and the Company, including:

a.      the nature and seriousness of the offense conduct that, among other things, involved placing hundreds of fraudulent spoof orders amounting to tens of billions of dollars of

3

false supply and demand in the secondary market for U.S. Treasuries, and as further described in the Statement of Facts attached hereto as Attachment A ("Statement of Facts");

b.      the Company did not receive voluntary disclosure credit pursuant to the Criminal Division's Corporate Enforcement and Voluntary Self-Disclosure Policy, or pursuant to U.S.S.G. § 8C2.5(g)(1), because it did not voluntarily and timely disclose to the Fraud Section the conduct described in the Statement of Facts;

c.      the Company received credit for its cooperation with the Fraud Section's investigation pursuant to U.S.S.G. § 8C2.5(g)(2) because it cooperated with the investigation and demonstrated recognition and affirmative acceptance of responsibility for its criminal conduct;  the Company also received credit for its cooperation and remediation pursuant to the Criminal Division's Corporate Enforcement and Voluntary Self-Disclosure Policy.   Such cooperation included, among other things, providing factual updates and presentations, agreeing to toll applicable statutes of limitation, making witnesses available for interviews including voluntarily making foreign-based employees available for interviews in the United States, and collecting, analyzing, and organizing voluminous evidence and information for the Fraud Section. The Company's cooperation was, however, largely reactive, including because the Company did not conduct its own comprehensive investigation or data analysis of the relevant trading, and did not proactively disclose potentially relevant facts in a timely manner;

d.      the Company provided to the Fraud Section all relevant non-privileged facts known to it, including information about the individuals involved in the conduct described in the Statement of Facts and conduct disclosed to the Fraud Section prior to the Agreement;

e.    the Company also received credit pursuant to the Criminal Division Corporate Enforcement and Voluntary Self-Disclosure Policy because the Company engaged in timely remedial measures, including terminating the offending trader, reviewing and continuing to enhance the compliance function, conducting additional market manipulation training with an emphasis on spoofing, and implementing and enhancing applicable trade surveillance programs;

f.    the Company and TDGUS have enhanced and have committed to continuing to enhance the Company's compliance program and internal controls, including ensuring that the Company's compliance program satisfies the minimum elements set forth in Attachment C to this Agreement (Corporate Compliance Program);

g.    based on the Company's remediation and the state of its compliance program, and the Company's and TDGUS's agreement to report to the Fraud Section as set forth in Attachment D to this Agreement (Corporate Compliance Reporting), the Fraud Section determined that an independent compliance monitor was unnecessary;

h.    the Company has no prior criminal history;

i.    the Company has been the subject of prior civil or regulatory enforcement matters with U.S. regulators;

j.    the Company and TDGUS have agreed to continue to cooperate with the Fraud Section in any ongoing investigation as described in Paragraphs 5 and 6; and

k.    the Company has agreed to resolve concurrently SEC and FINRA investigations relating to the conduct described in the Statement of Facts and agreed to pay a $6,500,000 civil penalty and $400,000 in disgorgement plus $135,700 in prejudgment interest in

connection with the SEC matter and agreed to pay a $6,000,000 civil penalty in connection with the FINRA matter;

l.      accordingly, after considering (a) through (l) above, the Fraud Section has determined that a discount of 5 percent off the bottom of the applicable U.S. Sentencing Guidelines fine range is appropriate under the Criminal Division Corporate Enforcement and Voluntary Self-Disclosure Policy and the appropriate resolution of this case is a deferred prosecution agreement and a criminal penalty of $9,414,664, twice the gross loss caused by the offense, which is the statutory maximum fine that may be imposed under Title 18, United States Code, Section 3571(d); $4,707,332 in victim compensation, and $1,403,906 in forfeiture, $400,000 of which will be credited against disgorgement of ill-gotten profits that the Company pays to the SEC in its concurrent resolution; and for the Company to abide by the compliance reporting requirements described in Attachment D to this Agreement.

## Ongoing Cooperation and Disclosure Requirements

5.      The Company and TDGUS and its subsidiaries shall cooperate fully with the Fraud Section in any and all matters relating to the conduct described in this Agreement and the Statement of Facts and other conduct under investigation by the Fraud Section at any time during the Term until the later of the date upon which all investigations and prosecutions arising out of such conduct are concluded, or the end of the Term.  At the request of the Fraud Section, the Company and TDGUS and its subsidiaries shall also cooperate fully with other domestic or foreign law enforcement and regulatory authorities and agencies in any investigation of the Company, TDGUS, or their affiliates, or any of their present or former officers, directors, employees, agents, and consultants, or any other party, in any and all matters relating to the conduct described in this

Agreement and the Statement of Facts and other conduct under investigation by the Fraud Section or any other component of the Department of Justice at any time during the Term. The Company's and TDGUS and its subsidiaries' cooperation pursuant to this Paragraph is subject to applicable law and regulations, as well as valid claims of attorney-client privilege or attorney work product doctrine; however, the Company and TDGUS and its subsidiaries must provide to the Fraud Section a log of any information or cooperation that is not provided based on an assertion of law, regulation, or privilege, and the Company and TDGUS and its subsidiaries bear the burden of establishing the validity of any such an assertion. The Company and TDGUS and its subsidiaries agree that their cooperation pursuant to this paragraph shall include, but not be limited to, the following:

        a.     The Company represents that it has timely and truthfully disclosed all factual information with respect to its activities, those of its subsidiaries and affiliates, and those of its present and former directors, officers, employees, agents, and consultants relating to the conduct described in this Agreement and the Statement of Facts, as well as any other conduct under investigation by the Fraud Section at any time about which the Company has any knowledge. The Company and TDGUS further agree that they shall promptly and truthfully disclose all factual information with respect to their activities, those of their parent company and affiliates, and those of their present and former directors, officers, employees, agents, and consultants about which the Company or TDGUS or its subsidiaries shall gain any knowledge or about which the Fraud Section may inquire. This obligation of truthful disclosure includes, but is not limited to, the obligation of the Company and TDGUS and its subsidiaries to provide to the Fraud Section, upon request, any document, record or other tangible evidence about which the Fraud Section may inquire of the

Company or TDGUS and its subsidiaries including evidence that is responsive to any requests made prior to the execution of this Agreement.

b.      Upon request of the Fraud Section, the Company and TDGUS and its subsidiaries shall designate knowledgeable employees, agents or attorneys to provide to the Fraud Section the information and materials described in Paragraph 5(a) above on behalf of the Company and TDGUS and its subsidiaries.  It is further understood that the Company and TDGUS and its subsidiaries must at all times provide complete, truthful, and accurate information.

c.      The Company and TDGUS and its subsidiaries shall use their best efforts to make available for interviews or testimony, as requested by the Fraud Section, present or former officers, directors, employees, agents and consultants of the Company or TDGUS and its subsidiaries.  This obligation includes, but is not limited to, sworn testimony before a federal grand jury or in federal trials, as well as interviews with domestic or foreign law enforcement and regulatory authorities.  Cooperation under this Paragraph shall include identification of witnesses who, to the knowledge of the Company or TDGUS and its subsidiaries, may have material information regarding the matters under investigation.

d.      With respect to any information, testimony, documents, records or other tangible evidence provided to the Fraud Section pursuant to this Agreement, the Company and TDGUS consent to any and all disclosures, subject to applicable laws and regulations, to other governmental authorities, including United States authorities and those of a foreign government of such materials as the Fraud Section, in its sole discretion, shall deem appropriate.

6.      In addition to the obligations in Paragraph 5, during the Term, should the Company or TDGUS learn of any evidence or allegation of violations by the Company of (A) U.S. fraud

8

laws including, but not limited to, the wire fraud statute, Title 18, United States Code, Section 1343; or (B) market manipulation, meaning, conduct which may constitute a violation of (i) the anti-fraud, anti-spoofing, and/or anti-manipulation provisions of the Commodity Exchange Act, Title 7, United States Code, Section 1, et seq.; (ii) the securities and commodities fraud statute, Title 18, United States Code, Section 1348; or (iii) the federal securities laws prohibiting manipulative and deceptive devices, Title 15, United States Code, Sections 78j(b) and 78ff(a), and Title 17, Code of Federal Regulations, Section 240.10b-5 (collectively, "the U.S. Anti-Fraud, Securities and Commodities Laws"), the Company and TDGUS shall promptly report such evidence or allegation to the Fraud Section.

<u>**Payment of Monetary Penalty**</u>

7.     The Fraud Section and the Company agree that application of the United States Sentencing Guidelines ("USSG" or "Sentencing Guidelines") to determine the applicable fine range yields the following analysis:

9

a.      The 2023 USSG are applicable to this matter.

b.      <u>Offense Level</u>.  Based upon USSG § 2B1.1, the total offense level is 29, calculated as follows:

| (a)(2) | Base Offense Level | 7 |
|---|---|---|
| (b)(1)(J) | Loss of More Than $3,500,000 | +18 |
| (b)(2) | More Than 10 Victims | +2 |
| (b)(10) | Sophisticated Means | +2 |
| **TOTAL** | | 29 |

c.      <u>Base Fine</u>.  Based upon USSG § 8C2.4(a)(1), the base fine is $15,000,000.

d.      <u>Culpability Score</u>.  Based upon USSG § 8C2.5, the culpability score is 5, calculated as follows:

| (a) | Base Culpability Score | 5 |
|---|---|---|
| (b)(4) | The organization had 50 or more employees and an individual within substantial authority personnel participated in, condoned, or was willfully ignorant of the offense | +2 |
| (g)(2) | The organization cooperated in the investigation, and clearly demonstrated recognition and affirmative acceptance of responsibility for its criminal conduct | - 2 |
| **TOTAL** | | 5 |

<u>Calculation of Fine Range</u>:

| | |
|---|---|
| Base Fine | $15,000,000 |
| Multipliers | 1.0 (min)/2.0 (max) |
| Fine Range | $15,000,000 / $30,000,000 |

8.      The Fraud Section and the Company agree, based on the application of the Sentencing Guidelines, that the appropriate criminal penalty is $9,414,664, the statutory maximum for the offense under Title 18, United States Code, Section 3571(d).

9.      The Company agrees to pay a monetary penalty in the amount of $9,414,664 to the United States Treasury no later than ten business days after the Agreement is fully executed, of which $3,000,000 will be paid to the U.S. Postal Inspection Service's Consumer Financial Fraud Fund.  The Company and the Fraud Section agree that this penalty is appropriate given the facts and circumstances of this case, including the Relevant Considerations described in Paragraph 4 of this Agreement.  The $9,414,664 penalty is final and shall not be refunded.  Furthermore, nothing in this Agreement shall be deemed an agreement by the Fraud Section that $9,414,664 is the maximum penalty that may be imposed in any future prosecution, and the Fraud Section is not precluded from arguing in any future prosecution that the Court should impose a higher fine, although the Fraud Section agrees that under those circumstances, it will recommend to the Court that any amount paid under this Agreement should be offset against any fine the Court imposes as part of a future judgment.  The Company acknowledges that no tax deduction may be sought in connection with the payment of any part of this $9,414,664 penalty.  The Company shall not seek or accept directly or indirectly reimbursement or indemnification from any source with regard to the penalty or disgorgement amounts that the Company pays pursuant to this Agreement or any other agreement entered into with an enforcement authority or regulator concerning the facts set forth in the Statement of Facts.

## Forfeiture

10.     As a result of the Company's conduct, including the conduct set forth in the Statement of Facts, the parties agree the Fraud Section could institute a civil and/or criminal

11

forfeiture action against certain funds held by the Company and that such funds would be forfeitable pursuant to Title 18, United States Code, Section 981(a)(1)(C) and 982(a)(2) and Title 28, United States Code, Section 2461(c). The Company hereby admits that the facts set forth in the Statement of Facts establish that at least $1,403,906, representing the proceeds traceable to the commission of the offense, is forfeitable to the United States (the "Forfeiture Amount"). The Company releases any and all claims it may have to the Forfeiture Amount, agrees that the forfeiture of such funds may be accomplished either administratively or judicially at the Fraud Section's election, and waives the requirements of any applicable laws, rules or regulations governing the forfeiture of assets, including notice of the forfeiture. If the Fraud Section seeks to forfeit the Forfeiture Amount judicially or administratively, the Company consents to entry of an order of forfeiture or declaration of forfeiture directed to such funds and waives any defense it may have under Title 18, United States Code, Sections 981-984, including but not limited to notice, statute of limitations, and venue. The Company agrees to sign any additional documents necessary to complete forfeiture of the Forfeiture Amount. The Company also agrees that it shall not file any petitions for remission, restoration, or any other assertion of ownership or request for return relating to the Forfeiture Amount, or any other action or motion seeking to collaterally attach the seizure, restraint, forfeiture, or conveyance of the Forfeiture Amount, nor shall it assist any others in filing any such claims, petitions, actions, or motions. The Fraud Section agrees that anticipated payments by the Company in connection with a concurrent resolution with the SEC shall be credited against the Forfeiture Amount in the amount of $400,000 (the "Forfeiture Credit Amount"). Should any amount of the Forfeiture Credit Amount not be paid to the SEC in connection with the Company's resolution with the SEC, the Company agrees that it shall make a payment of any remaining unpaid portion of the Forfeiture Credit Amount by wire transfer

12

pursuant to instructions provided by the Fraud Section no later than 10 days after one year from the date of the Agreement. The remaining $1,003,906 of the Forfeiture Amount will be paid to the U.S. Postal Inspection Service's Consumer Fraud Fund.

11.     Any portion of the Forfeiture Amount that is paid is final and shall not be refunded should the Fraud Section later determine that the Company has breached this Agreement and commence a prosecution against the Company. In the event of a breach of this Agreement and subsequent prosecution, the Fraud Section is not limited to the Forfeiture Amount. The Fraud Section agrees that in the event of a subsequent breach and prosecution, it will recommend to the Court that the amounts paid pursuant to this Agreement be offset against whatever forfeiture the Court shall impose as part of its judgment. The Company understands that such a recommendation will not be binding on the Court.

**Payment of Victim Compensation Amount**

12.     The Company agrees to pay the amount of $4,707,332 in order to compensate victims for their losses as set forth in Paragraph 4(m) above (the "Victim Compensation Amount"). The Company shall pay the full Victim Compensation Amount into an escrow account ("Escrow Account") no later than ten (10) business days after the Agreement is fully executed. The Fraud Section shall have sole discretion to determine how the Victim Compensation Amount will be disbursed. The Company and the Fraud Section agree that the appointment of a Victim Compensation Administrator (the "Administrator") is appropriate and necessary to determine the proper administration and disbursement of the Victim Compensation Amount. The Administrator, consistent with a process imposed and required by the Fraud Section, will make recommendations to the Fraud Section regarding: (a) the victims who should receive payments from the Victim Compensation Amount; and (b) the amounts that these victims should receive. The Company

agrees to pay for all costs, fees, and expenses incurred by the Administrator. The Company shall execute an engagement letter with the Administrator that must be approved, in advance of execution, by the Fraud Section. Within thirty (30) business days after the execution of the Agreement, the Company shall submit a written proposal identifying three (3) candidates to serve as the Administrator, setting forth the candidates qualifications and credentials. The Fraud Section retains the right, in its sole discretion, to choose the Administrator from among the candidates proposed by the Company. The Fraud Section and the Company will use their best efforts to complete the selection process within thirty (30) calendar days of when the candidates have been submitted to the Fraud Section.

13.    The Company agrees that it will not employ or be affiliated with the Administrator for a period of not less than three years from the date on which the Administrator's term expires. Nor will the Company discuss with the Administrator the possibility of further employment or affiliation during the Administrator's term. Upon agreement by the parties, this prohibition will not apply to any other claims administration responsibilities that the Administrator may undertake in connection with resolutions with foreign or other domestic authorities.

14.    After the Administrator is selected, the Fraud Section shall provide the Administrator with a list of all identifiable victims. The Administrator shall provide written notice to all such victims of the process and procedure for submitting a claim for payment. The Administrator shall send the initial notice within sixty (60) days after the effective date of this Agreement (or thirty (30) days after the Administrator is selected, whichever is later), and a follow-up notice sixty (60) days later. Any victim that believes it is entitled to funds from the Victim Compensation Amount must submit a claim to the Administrator during the Term. Any portion of the Victim Compensation Amount that (a) has not been paid out to victims during the Term and

14

(b) is not subject to a pending claim submitted to the Administrator, shall revert to the Company. Any portion of the Victim Compensation Amount that is subject to a pending claim submitted to the Administrator shall remain in escrow until the claim is fully resolved, after which the remaining funds, if any, shall revert to the Company. The Company agrees that it will not use the fact that a victim seeks or receives any money from the Victim Compensation Amount to seek to preclude such victim from pursuing any other lawful claim that such victim might have against the Company.

### Conditional Release from Liability

15.     Subject to Paragraphs 23 through 27, the Fraud Section agrees, except as provided in this Agreement, that it will not bring any criminal or civil case against the Company or TDGUS relating to any of the conduct described in the Statement of Facts or the criminal Information filed pursuant to this Agreement. The Fraud Section, however, may use any information related to the conduct described in the Statement of Facts against the Company or TDGUS:  (a) in a prosecution for perjury or obstruction of justice; (b) in a prosecution for making a false statement; (c) in a prosecution or other proceeding relating to any crime of violence; or (d) in a prosecution or other proceeding relating to a violation of any provision of Title 26 of the United States Code.

a.      This Agreement does not provide any protection against prosecution for any future conduct by the Company or TDGUS, or any of their subsidiaries or affiliates.

b.      In addition, this Agreement does not provide any protection against prosecution of any individuals, regardless of their affiliation with the Company or TDGUS, or any of their subsidiaries or affiliates.

**Corporate Compliance Program**

16.     The Company and TDGUS represent that they have implemented and will continue to implement a compliance and ethics program at the Company designed to prevent and detect violations of the U.S. Anti-Fraud, Securities and Commodities Laws throughout the Company's operations, including those of its subsidiaries, agents, and joint ventures, and those of its contractors and subcontractors whose responsibilities include activities in securities or commodities markets, including, but not limited to, the minimum elements set forth in Attachment C.

17.     In order to address any deficiencies in its internal controls, policies, and procedures, the Company and TDGUS represent that they have undertaken, and will continue to undertake in the future, in a manner consistent with all of its obligations under this Agreement, review of the Company's existing internal controls, policies, and procedures regarding compliance with the U.S. Anti-Fraud, Securities and Commodities Laws. Where necessary and appropriate, the Company and TDGUS agree to adopt a new compliance program at the Company, or to modify its existing one, including internal controls, compliance policies, and procedures in order to ensure that the Company maintains a rigorous compliance program that incorporates relevant internal controls, as well as policies and procedures designed to effectively detect and deter violations the U.S. Anti-Fraud, Securities and Commodities Laws.  The compliance program, including the internal controls system will include, but not be limited to, the minimum elements set forth in Attachment C.

**Corporate Compliance Reporting**

18.     The Company and TDGUS agree that they will report to the Fraud Section annually during the Term regarding remediation and implementation of the compliance measures described in Attachment C.  These reports will be prepared in accordance with Attachment D.

19.     On the date the Term expires, the Company and TDGUS, by the Chief Executive Officer and Chief Compliance Officer of the Company, and the Chief Executive Officer and Chief Compliance Officer of TDGUS, will certify to the Fraud Section, in the form of executing the document attached as Attachment F to this Agreement, that the Company has met its compliance obligations pursuant to this Agreement.  Each certification will be deemed a material statement and representation by the Company and TDGUS to the executive branch of the United States for purposes of Title 18, United States Code, Sections 1001 and 1519, and it will be deemed to have been made in the judicial district in which this Agreement is filed.

**Deferred Prosecution**

20.     In consideration of the undertakings agreed to by the Company and TDGUS herein, the Fraud Section agrees that any prosecution of the Company for the conduct set forth in the Statement of Facts be and hereby is deferred for the Term.  To the extent there is conduct disclosed by the Company or TDGUS that is not set forth in the Statement of Facts, such conduct will not be exempt from further prosecution and is not within the scope of or relevant to this Agreement.

21.     The Fraud Section further agrees that if the Company and TDGUS fully comply with all of their obligations under this Agreement, the Fraud Section will not continue the criminal prosecution against the Company described in Paragraph 1 and, at the conclusion of the Term, this Agreement shall expire.  Within six months after the Agreement's expiration, the Fraud Section shall seek dismissal with prejudice of the criminal Information filed against the Company

17

described in Paragraph 1, and agrees not to file charges in the future against the Company based on the conduct described in this Agreement and the Statement of Facts. If, however, the Fraud Section determines during this six-month period that the Company or TDGUS breached the Agreement during the Term, as described in Paragraph 22, the Fraud Section's ability to extend the Term, as described in Paragraph 3, or to pursue other remedies, including those described in Paragraphs 22 through 26, remains in full effect.

<u>**Breach of the Agreement**</u>

22.     If, during the Term, (a) the Company commits any felony under U.S. federal law; (b) the Company or TDGUS provides in connection with this Agreement deliberately false, incomplete, or misleading information, including in connection with its disclosure of information about individual culpability; (c) the Company or TDGUS fails to cooperate as set forth in Paragraphs 5 and 6 of this Agreement; (d) the Company or TDGUS fails to implement a compliance program as set forth in Paragraphs 16 and 17 of this Agreement and Attachment C; (e) the Company commits any acts that, had they occurred within the jurisdictional reach of the U.S. Anti-Fraud, Securities and Commodities Laws, would be a violation of the U.S. Anti-Fraud, Securities, and Commodities Laws; or (f) the Company or TDGUS otherwise fails to completely perform or fulfill each of the Company's or TDGUS's obligations under the Agreement, regardless of whether the Fraud Section becomes aware of such a breach after the Term is complete, the Company or TDGUS shall thereafter be subject to prosecution for any federal criminal violation of which the Fraud Section has knowledge, including, but not limited to, the charges in the Information described in Paragraph 1, which may be pursued by the Fraud Section in the U.S. District Court for the District of New Jersey or any other appropriate venue. Determination of whether the Company or TDGUS has breached the Agreement and whether to pursue prosecution

of the Company or TDGUS shall be in the Fraud Section's sole discretion.  Any such prosecution may be premised on information provided by the Company, TDGUS or their personnel.  Any such prosecution relating to the conduct described in the Statement of Facts or relating to conduct known to the Fraud Section prior to the date on which this Agreement was signed that is not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against the Company or TDGUS, notwithstanding the expiration of the statute of limitations, between the signing of this Agreement and the expiration of the Term plus one year.  Thus, by signing this Agreement, the Company and TDGUS  agree that the statute of limitations with respect to any such prosecution that is not time-barred on the date of the signing of this Agreement shall be tolled for the Term plus one year.  In addition, the Company and TDGUS agree that the statute of limitations as to any violation of the U.S. Anti-Fraud, Securities and Commodities Laws that occurs during the Term will be tolled from the date upon which the violation occurs until the earlier of the date upon which the Fraud Section is made aware of the violation or the duration of the Term plus five years, and that this period shall be excluded from any calculation of time for purposes of the application of the statute of limitations.

23.     In the event the Fraud Section determines that the Company or TDGUS has breached this Agreement, the Fraud Section agrees to provide the Company and TDGUS with written notice of such breach prior to instituting any prosecution resulting from such breach.  Within thirty days of receipt of such notice, the Company and TDGUS shall have the opportunity to respond to the Fraud Section in writing to explain the nature and circumstances of such breach, as well as the actions the Company and TDGUS have taken to address and remediate the situation, which explanation the Fraud Section shall consider in determining whether to pursue prosecution of the Company or TDGUS.

24.    In the event that the Fraud Section determines that the Company or TDGUS has breached this Agreement: (a) all statements made by or on behalf of the Company or TDGUS to the Fraud Section or to the Court, including the Statement of Facts, and any testimony given by the Company or TDGUS before a grand jury, a court, or any tribunal, or at any legislative hearings, whether prior or subsequent to this Agreement, and any leads derived from such statements or testimony, shall be admissible in evidence in any and all criminal proceedings brought by the Fraud Section against the Company or TDGUS; and (b) the Company and TDGUS shall not assert any claim under the United States Constitution, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule that any such statements or testimony made by or on behalf of the Company or TDGUS prior or subsequent to this Agreement, or any leads derived therefrom, should be suppressed or are otherwise inadmissible. The decision whether conduct or statements of any current director, officer or employee, or any person acting on behalf of, or at the direction of, the Company or TDGUS, will be imputed to the Company or TDGUS for the purpose of determining whether the Company or TDGUS has violated any provision of this Agreement shall be in the sole discretion of the Fraud Section.

25.    The Company and TDGUS acknowledge that the Fraud Section has made no representations, assurances, or promises concerning what sentence may be imposed by the Court if the Company or TDGUS breaches this Agreement and this matter proceeds to judgment. The Company and TDGUS further acknowledge that any such sentence is solely within the discretion of the Court and that nothing in this Agreement binds or restricts the Court in the exercise of such discretion.

26.    On the date that the Term expires, the Company, by the Chief Executive Officer of the Company and the Chief Financial Officer of the Company, and TDGUS, by the Chief

Executive Officer of TDGUS and the Chief Financial Officer of TDGUS, will certify to the Fraud Section in the form of executing the document attached as Attachment E to this Agreement that the Company and TDGUS have  met their disclosure obligations pursuant to Paragraph 6 of this Agreement.  Each certification will be deemed a material statement and representation by the Company and TDGUS to the executive branch of the United States for purposes of 18 U.S.C. §§ 1001 and 1519, and it will be deemed to have been made in the judicial district in which this Agreement is filed.

**Sale, Merger, or Other Change in Corporate Form of Company**

27.     Except as may otherwise be agreed by the parties in connection with a particular transaction, the Company and TDGUS agree that in the event that, during the Term, either undertakes any change in corporate form, including if either sells, merges, or transfers business operations that are material to the Company's consolidated operations, or to the operations of any subsidiaries or affiliates involved in the conduct described in the Statement of Facts, as they exist as of the date of this Agreement, whether such sale is structured as a sale, asset sale, merger, transfer, or other change in corporate form, it shall include in any contract for sale, merger, transfer, or other change in corporate form a provision binding the purchaser, or any successor in interest thereto, to the obligations described in this Agreement.  The purchaser or successor in interest must also agree in writing that the Fraud Section's ability to determine a breach under this Agreement is applicable in full force to that entity.  The Company and TDGUS agree that the failure to include these provisions in the transaction will make any such transaction null and void.  The Company and TDGUS shall provide notice to the Fraud Section at least thirty (30) days prior to undertaking any such sale, merger, transfer, or other change in corporate form.  The Fraud Section shall notify the Company and TDGUS prior to such transaction (or series of transactions) if they have

21

determined that the transaction or transactions will have the effect of circumventing or frustrating the enforcement purposes of this Agreement, as determined in the sole discretion of the Fraud Section. If at any time during the Term the Company or TDGUS engages in a transaction(s) that has the effect of circumventing or frustrating the enforcement purposes of this Agreement, the Fraud Section may deem it a breach of this Agreement pursuant to Paragraphs 22 through 26 of this Agreement. Nothing herein shall restrict the Company and TDGUS from indemnifying (or otherwise holding harmless) the purchaser or successor in interest for penalties or other costs arising from any conduct that may have occurred prior to the date of the transaction, so long as such indemnification does not have the effect of circumventing or frustrating the enforcement purposes of this Agreement, as determined by the Fraud Section.

### Public Statements

28.     The Company and TDGUS expressly agree that they shall not, through present or future attorneys, officers, directors, employees, agents or any other person authorized to speak for the Company or TDGUS make any public statement, in litigation or otherwise, contradicting the acceptance of responsibility by the Company set forth above or the facts described in the Statement of Facts. Any such contradictory statement shall, subject to cure rights of the Company and TDGUS described below, constitute a breach of this Agreement, and the Company and TDGUS thereafter shall be subject to prosecution as set forth in Paragraphs 22 through 26 of this Agreement. The decision whether any public statement by any such person contradicting a fact contained in the Statement of Facts will be imputed to the Company or TDGUS for the purpose of determining whether either has breached this Agreement shall be at the sole discretion of the Fraud Section. If the Fraud Section determines that a public statement by any such person contradicts in whole or in part a statement contained in the Statement of Facts, the Fraud Section shall so notify

the Company and TDGUS, and the Company and TDGUS may avoid a breach of this Agreement by publicly repudiating such statement(s) within five business days after notification. The Company and TDGUS shall be permitted to raise defenses and to assert affirmative claims in other proceedings relating to the matters set forth in the Statement of Facts provided that such defenses and claims do not contradict, in whole or in part, a statement contained in the Statement of Facts. This Paragraph does not apply to any statement made by any present or former officer, director, employee, or agent of the Company or TDGUS in the course of any criminal, regulatory, or civil case initiated against such individual, unless such individual is speaking on behalf of the Company or TDGUS.

29. The Company and TDGUS agree that if they, or any of their direct or indirect subsidiaries or affiliates issues a press release or holds any press conference in connection with this Agreement, the Company and TDGUS shall first consult with the Fraud Section to determine (a) whether the text of the release or proposed statements at the press conference are true and accurate with respect to matters between the Fraud Section and the Company and TDGUS; and (b) whether the Fraud Section has any objection to the release.

30. The Fraud Section agrees, if requested to do so, to bring to the attention of law enforcement and regulatory authorities the facts and circumstances relating to the nature of the conduct underlying this Agreement, including the nature and quality of the Company's cooperation and remediation. By agreeing to provide this information to such authorities, the Fraud Section is not agreeing to advocate on behalf of the Company, but rather is agreeing to provide facts to be evaluated independently by such authorities.

## Limitations on Binding Effect of Agreement

31.     This Agreement is binding on the Company, TDGUS, and the Fraud Section but specifically does not bind any other component of the Department of Justice, other federal agencies, or any state, local or foreign law enforcement or regulatory agencies, or any other authorities, although the Fraud Section will bring the cooperation of the Company and its compliance with its other obligations under this Agreement to the attention of such agencies and authorities if requested to do so by the Company.  If the court refuses to grant exclusion of time under the Speedy Trial Act, 18 U.S.C. § 3161(h)(2), all the provisions of this Agreement shall be deemed null and void, and the Term shall be deemed to have not begun, except that the statute of limitations for any prosecution relating to the conduct described in the Statement of Facts shall be tolled from the date on which this Agreement is signed until the date the Court refuses to grant the exclusion of time plus six months, and except for the provisions contained within Paragraph 2 of this Agreement.

## Notice

32.     Any notice to the Fraud Section under this Agreement shall be given by electronic mail and/or personal delivery, overnight delivery by a recognized delivery service, or registered or certified mail, addressed to Deputy Chief, MIMF Unit, Fraud Section, Criminal Division, U.S. Department of Justice, 1400 New York Avenue NW, Washington, DC 20005.  Any notice to the Company or TDGUS under this Agreement shall be given by personal delivery, overnight delivery by a recognized delivery service, or registered or certified mail, with copies by electronic mail, addressed to Cynthia Adams, U.S. Head and General Counsel, TD Bank, 1 Vanderbilt Avenue, 14th Floor, New York, NY 10017.  Notice shall be effective upon actual receipt by the Fraud Section or the Company and TDGUS.

24

## **Complete Agreement**

33.     This Agreement, including its attachments, sets forth all the terms of the agreement between the Company, TDGUS, and the Fraud Section.  No amendments, modifications or additions to this Agreement shall be valid unless they are in writing and signed by the Fraud Section, the attorneys for the Company and TDGUS and a duly authorized representative of the Company and TDGUS.

**AGREED:**

**FOR TD SECURITIES (USA) LLC:**

Date: 27/09/2024                              By: _____
                                                                    Glenn Gibson
                                                                    Chief Executive Officer
                                                                    TD Securities (USA) LLC


Date: 09/29/2024                             By: _____
                                                                    Martine M. Beamon
                                                                    Paul S. Mishkin
                                                                    Fuad Rana
                                                                    Davis Polk & Wardwell LLP

**FOR TD GROUP US HOLDINGS LLC:**

Date: 9/29/24                                    By: _____
                                                                    Cynthia Adams
                                                                    General Counsel
                                                                    TD Group US Holdings LLC

Date: _09/29/2024_        By: _____

                                   Martine M. Beamon
                                   Paul S. Mishkin
                                   Fuad Rana
                                   Davis Polk & Wardwell LLP

**FOR THE DEPARTMENT OF JUSTICE:**

                                   Glenn S. Leon
                                   Chief, Fraud Section
                                   Criminal Division
                                   United States Department of Justice

Date: _9/29/2024_        BY: _____

                                   John J. Liolos
                                   Trial Attorney

## COMPANY OFFICER'S CERTIFICATE

I have read this Agreement and carefully reviewed every part of it with outside counsel for TD Securities (USA) LLC (the "Company"). I understand the terms of this Agreement and voluntarily agree, on behalf of the Company, to each of its terms. Before signing this Agreement, I consulted outside counsel for the Company. Counsel fully advised me of the rights of the Company, of possible defenses, of the Sentencing Guidelines' provisions, and of the consequences of entering into this Agreement.

I have carefully reviewed the terms of this Agreement with the Board of Directors of the Company. I have advised and caused outside counsel for the Company to advise the Board of Directors fully of the rights of the Company, of possible defenses, of the Sentencing Guidelines' provisions, and of the consequences of entering into the Agreement.

No promises or inducements have been made other than those contained in this Agreement. Furthermore, no one has threatened or forced me, or to my knowledge any person authorizing this Agreement on behalf of the Company, in any way to enter into this Agreement. I am also satisfied with outside counsel's representation in this matter. I certify that I am the Chief Executive Officer for the Company and that I have been duly authorized by the Company to execute this Agreement on behalf of the Company.

Date: 27/09/2024

TD Securities (USA) LLC

By: _____

Glenn Gibson
Chief Executive Officer
TD Securities (USA) LLC

## COMPANY OFFICER'S CERTIFICATE

I have read this Agreement and carefully reviewed every part of it with outside counsel for TD Group US Holdings LLC ("TDGUS"). I understand the terms of this Agreement and voluntarily agree, on behalf of TDGUS, to each of its terms. Before signing this Agreement, I consulted outside counsel for TDGUS. Counsel fully advised me of the rights of TDGUS, of possible defenses, of the Sentencing Guidelines' provisions, and of the consequences of entering into this Agreement.

I have carefully reviewed the terms of this Agreement with the Board of Directors of TDGUS. I have advised and caused outside counsel for TDGUS to advise the Board of Directors fully of the rights of TDGUS, of possible defenses, of the Sentencing Guidelines' provisions, and of the consequences of entering into the Agreement.

No promises or inducements have been made other than those contained in this Agreement. Furthermore, no one has threatened or forced me, or to my knowledge any person authorizing this Agreement on behalf of TDGUS, in any way to enter into this Agreement. I am also satisfied with outside counsel's representation in this matter. I certify that I am the General Counsel for TDGUS and that I have been duly authorized by TDGUS to execute this Agreement on behalf of TDGUS.

Date: 9/29/24

TD Group US Holdings LLC

By: _____
Cynthia Adams
General Counsel

## CERTIFICATE OF COUNSEL

I am counsel for TD Securities (USA) LLC (the "Company") in the matter covered by this Agreement. In connection with such representation, I have examined relevant Company documents and have discussed the terms of this Agreement with the Company Board of Directors. Based on our review of the foregoing materials and discussions, I am of the opinion that the representative of the Company has been duly authorized to enter into this Agreement on behalf of the Company and that this Agreement has been duly and validly authorized, executed, and delivered on behalf of the Company and is a valid and binding obligation of the Company. Further, I have carefully reviewed the terms of this Agreement with the Board of Directors and the Chief Executive Officer of the Company. I have fully advised them of the rights of the Company, of possible defenses, of the Sentencing Guidelines' provisions and of the consequences of entering into this Agreement. To my knowledge, the decision of the Company to enter into this Agreement, based on the authorization of the Board of Directors, is an informed and voluntary one.

Date: 09/29/2024

By: _Fuad Rana_

Martine M. Beamon
Paul S. Mishkin
Fuad Rana
Davis Polk & Wardwell LLP
Counsel for TD Securities (USA) LLC

## CERTIFICATE OF COUNSEL

I am counsel for TD Group US Holdings LLC ("TDGUS") in the matter covered by this Agreement.  In connection with such representation, I have examined relevant TDGUS documents and have discussed the terms of this Agreement with TDGUS's Board of Directors.  Based on our review of the foregoing materials and discussions, I am of the opinion that the representative TDGUS has been duly authorized to enter into this Agreement on behalf of TDGUS and that this Agreement has been duly and validly authorized, executed, and delivered on behalf of TDGUS and is a valid and binding obligation of TDGUS.  Further, I have carefully reviewed the terms of this Agreement with the Board of Directors and the General Counsel of TDGUS.  I have fully advised them of the rights of TDGUS, of possible defenses, of the Sentencing Guidelines' provisions and of the consequences of entering into this Agreement.  To my knowledge, the decision of TDGUS to enter into this Agreement, based on the authorization of the Board of Directors, is an informed and voluntary one.

Date: 09/29/2024

By: *Fuad Rana*
　　　Martine M. Beamon
　　　Paul S. Mishkin
　　　Fuad Rana
　　　Davis Polk & Wardwell LLP

ATTACHMENT A

**STATEMENT OF FACTS**

1.      The following Statement of Facts is incorporated by reference as part of the Deferred Prosecution Agreement (the "Agreement") between the United States Department of Justice, Criminal Division, Fraud Section (the "Fraud Section") and TD Securities (USA) LLC ("TD").  TD hereby agrees and stipulates that the following information is true and accurate.  TD admits, accepts, and acknowledges that it is responsible for the acts of its officers, directors, employees, and agents as set forth below.  Should the Fraud Section pursue the prosecution that is deferred by this Agreement, TD agrees that it will neither contest the admissibility of, nor contradict, this Statement of Facts in any such proceeding.  The following facts establish beyond a reasonable doubt the charges set forth in the criminal Information attached to this Agreement:

Relevant Individuals and Entities

2.      At all times relevant to this Statement of Facts, TD was a financial institution with its principal offices located in New York, New York, where the TD desk that traded U.S. Treasuries ("U.S.T. Desk") was located.

3.      Jeyakumar Nadarajah was employed as a Director at TD.  In that capacity, Nadarajah was the Head of TD's U.S.T. Desk and traded U.S. Treasuries both on behalf of clients of TD and on behalf of TD.

4.      Broker-1 provided, among other things, markets for trading U.S. Treasuries.

Market Background and Definitions

5.      To raise capital to operate the federal government and finance the national debt, the U.S. Department of the Treasury ("Treasury") issued and sold marketable securities in the form of bills, notes, bonds, and certain related instruments at public auction (collectively, "U.S.

Treasuries"). U.S. Treasuries were subject to fixed terms at fixed interest rates determined by the prevailing rates in the marketplace at the time of issuance. U.S. Treasuries were issued in different denominations, including the five-year U.S. Treasury note, ten-year U.S. Treasury note, and 30-year U.S. Treasury bond (collectively, "U.S. Treasuries Products"). After the Treasury auctioned U.S. Treasuries Products, institutional and individual investors could buy and sell these securities in the secondary (or "cash") market.

6.      U.S. Treasuries Products were securities in all respects relevant to this Agreement.

7.      Broker-1 provided, among other financial services, an electronic marketplace for trading U.S. Treasuries Products in the cash market. Broker-1's servers for trading U.S. Treasuries Products were located in and around Secaucus, New Jersey, at all times relevant to this Statement of Facts.

8.      Individuals who sought to trade U.S. Treasuries Products on Broker-1 did so through a "Trader Identification" or user-id through which orders for U.S. Treasuries Products were placed, cancelled and executed. Broker-1 anonymized the identity of the market participants trading U.S. Treasuries Products such that any market participant could not view the user-id associated with another trader.

9.      Nadarajah traded U.S. Treasuries Products on Broker-1 with the Trader Identification "BUTDUJNA2I."

10.     As Head of the U.S.T. Desk at TD, Nadarajah was a manual trader and decided himself whether and how to place his orders for U.S. Treasuries Products on Broker-1, as opposed to operating an automated and algorithmic trading strategy.

11.     Broker-1 permitted, among other things, traders in the cash market for U.S. Treasuries Products to place orders to buy ("bid") or sell ("offer") a U.S. Treasury Product at a

specific price and amount ("lots"). Broker-1 displayed such orders in a visible "order book" that aggregated the bids and offers at specific prices until such orders were either cancelled or executed. An order was "filled" or "executed" when a buyer's bid price and a seller's offer price matched for a U.S. Treasuries Product.

12.  An "iceberg" order was a type of order that traders on Broker-1 could place either to buy or to sell U.S. Treasuries Products. With an iceberg order, a trader chose to display to other market participants in the order book only a pre-set number of lots in the overall order. If a trader filled the displayed quantity of lots, another order for the same number of lots and at the same price automatically replaced it in the order book. That process repeated itself until a trader either filled the overall number of lots in the order or cancelled it.

13.  By contrast, a "fully displayed" order on Broker-1 displayed at once in the order book all the lots in an order. Those lots could be filled by other counterparties until cancelled.

14.  "Spoofing" was the act or practice of bidding or offering with the intent, at the time the bid or offer was placed, to cancel the bid or offer before it was executed to give the false appearance of genuine supply or demand to other market participants.

15.  "Layering" was the act or practice of placing two or more spoof orders, often at different times and at different prices in the order book, to give the false appearance of genuine supply or demand to other market participants.

16.  Both Broker-1 and TD prohibited spoofing and layering in U.S. Treasuries Products.

**Spoofing and Layering Scheme**

17.     Nadarajah knew that spoofing constituted market manipulation, could give a false impression of supply and demand to other market participants trading U.S. Treasuries Products, and was a prohibited practice at TD.

18.     Nadarajah also knew that layering was also a form of market manipulation that involved efforts to move prices in a certain direction.

19.     Nonetheless, Nadarajah engaged in and executed a spoofing and layering scheme in the cash market for U.S. Treasuries Products on behalf of and to the benefit of TD.

20.     To carry out the scheme, Nadarajah placed the following orders in U.S. Treasuries Products:

a.     Nadarajah placed one or more orders for a U.S. Treasury Product that he intended to execute ("Genuine Orders").  Nadarajah placed one or more Genuine Orders usually as iceberg orders, so that only a portion of the Genuine Order's full quantity was displayed at any given time in the order book.

b.     In the same trading sequence, Nadarajah engaged in the act of spoofing and layering by placing opposite the Genuine Orders one or more orders that he did not intend to execute at the time the order was placed ("Spoof Orders").  For example, if Nadarajah placed a Genuine Order to buy, he placed one or more Spoof Orders to sell.  Nadarajah generally placed one or more Spoof Orders as fully displayed orders, so that the full quantity of each Spoof Order was displayed at once in the order book.

c.  After filling his Genuine Orders in whole or in part, Nadarajah quickly cancelled the Spoof Order(s) to attempt to avoid filling those orders, as he intended at the time of placing those orders.

21.  Nadarajah placed one or more Spoof Orders on both the bid and offer side in the cash market for U.S. Treasuries Products, depending on the placement on his Genuine Orders.

22.  By placing one or more Spoof Orders to buy U.S. Treasuries Products, Nadarajah intended to inject false and misleading information about genuine demand into the market and to manipulate and artificially increase the market prices of those products.  In this way, Nadarajah intended that one or more Spoof Orders to buy would fraudulently induce other market participants to fill his Genuine Orders to sell at artificial and manipulated prices.

23.  By placing one or more Spoof Orders to sell U.S. Treasuries products, Nadarajah intended to inject false and misleading information about genuine supply into the market and to manipulate and artificially decrease the market prices of those products.   In this way, Nadarajah intended that one or more Spoof Orders to sell would fraudulently induce other market participants to fill his Genuine Orders to buy at artificial and manipulated prices.

24.  In executing the scheme to defraud in connection with the purchase and sale of U.S. Treasuries Products and the placement of Spoof Orders, Nadarajah was acting within the scope of his employment as an employee of TD and its affiliates, and as an agent of TD, and with the intent, at least in part, to benefit TD.

25.  Nadarajah caused Spoof Orders in U.S. Treasuries Products to be transmitted electronically via interstate wire communications from TD's U.S.T. Desk located in and around New York, New York to Broker-1's servers located in and around Secaucus, New Jersey.

Examples of Unlawful Trading

26.    As one example of the unlawful trading, on or about May 8, 2019, at approximately 8:43:21.315351 a.m. ET, Nadarajah placed an iceberg Genuine Order to buy approximately 400 10-Year U.S. Treasury notes ("UST") at approximately $101.671875. Then, approximately 1.956089 seconds later, at 8:43:23.271440 a.m. ET, Nadarajah placed a Spoof Order to sell approximately 800 UST at approximately $101.687500, part of a group of approximately three Spoof Orders to sell a total of approximately 2,200 UST, with the intent to create the illusion of supply, deceive other market participants, induce other market participants to execute with the Genuine Order, and artificially move the market price lower. Next, approximately 46 microseconds after the first Spoof Order was placed, beginning at approximately 8:43:23.271486 a.m. ET, approximately 176 UST in the Genuine Order were filled. Lastly, approximately 2.497359 seconds after the last UST was filled, Nadarajah started canceling the group of Spoof Orders. After approximately 7.832 milliseconds, the Spoof Orders were canceled in their entirety.

27.    As another example of the unlawful trading, on or about May 8, 2019, at approximately 8:43:42.689653 a.m. ET, Nadarajah placed an iceberg Genuine Order to buy 100 UST at $101.671875. Then, approximately 21.523346 seconds later at 8:44:04.212999 a.m. ET, Nadarajah placed a Spoof Order to sell 444 UST at $101.687500, part of a group of approximately seven Spoof Orders to sell a total of approximately 1,893 UST, with the intent to create the illusion of supply, deceive other market participants, induce other market participants to execute with the Genuine Order, and artificially move the market price lower. Next, approximately 585 microseconds later, beginning at approximately 8:44:04.213584 a.m., 26 UST in the Genuine Order were filled. Lastly, approximately 1.594354 seconds after the last UST was filled, Nadarajah

started canceling his group of Spoof Orders. After approximately 22.34 milliseconds, the Spoof Orders were canceled in their entirety.

**BOARD OF DIRECTORS**
**TD SECURITIES (USA) LLC**

<u>**CERTIFICATE OF CORPORATE RESOLUTIONS FOR TD SECURITIES (USA) LLC**</u>

I, Suzanne Franco, hereby certify that:

I am the duly appointed Secretary of TD Securities (USA) LLC, a limited liability company organized under the laws of Delaware (the "Company"), and as such have access to the Company records and am familiar with the matters herein certified.

I further certify that the following is a correct and complete representation of the resolutions duly adopted by the Managing Board of Directors of the Company (the "Board") via Minutes of Action following a Special Meeting of the Board on September 26, 2024, at 10:30 a.m., at which the Board was joined by outside counsel to consider the matter discussed herein.

WHEREAS, TD Securities (USA) LLC has been engaged in discussions with the United States Department of Justice, Criminal Division, Fraud Section (the "Fraud Section") regarding issues arising in relation to fraudulent trading in the secondary market for U.S. Treasuries;

WHEREAS, in order to resolve such discussions, it is proposed that the Company enter into a certain agreement with the Fraud Section;

WHEREAS, the Company's Chief Executive Officer, Glenn Gibson, together with outside counsel for the Company, have advised the Board of Directors of the Company of its rights, possible defenses, the Sentencing Guidelines' provisions, and the consequences of entering into such agreement with the Fraud Section;

NOW, THEREFORE, BE IT RESOLVED, that the Company (a) acknowledges the filing of the one-count Information charging the Company with 18 United States Code Section 1343; (b) waives indictment on such charge and enters into a deferred prosecution agreement with the Fraud Section; (c) agrees to accept a monetary penalty against the Company totaling $9,414,664, and to pay $3,000,000 of such penalty to the U.S. Postal Service's Consumer Fraud Fund, and to pay the remainder to the U.S. Treasury with respect to the conduct described in the Information; (d) agrees to place into escrow a victim compensation payment in the amount of $4,707,332, to be distributed by a claims administrator as provided in the Agreement; (e) agrees to pay forfeiture totaling $1,403,906, with credit for up to $400,000 in disgorgement paid to the Securities & Exchange Commission in connection with their parallel resolution, and the remainder paid to the U.S. Postal Inspection Service Consumer Fraud Fund;

RESOLVED FURTHER, that the Company accepts the terms and conditions of this Agreement, including, but not limited to, (a) a knowing waiver of its rights to a speedy trial

B-1

pursuant to the Sixth Amendment to the United States Constitution, Title 18, United States Code, Section 3161, and Federal Rule of Criminal Procedure 48(b); and (b) a knowing waiver for purposes of this Agreement and any charges by the United States arising out of the conduct described in the attached Statement of Facts of any objection with respect to venue and consents to the filing of the Information, as provided under the terms of this Agreement; and (c) a knowing waiver of any defenses based on the statute of limitations for any prosecution relating to the conduct described in the attached Statement of Facts or relating to conduct known to the Fraud Section prior to the date on which this Agreement was signed that is not time-barred by the applicable statute of limitations on the date of the signing of this Agreement;

RESOLVED FURTHER, that the Company's Chief Executive Officer, Glenn Gibson, is hereby authorized, empowered and directed, on behalf of the Company, to execute the Deferred Prosecution Agreement substantially in such form as reviewed by this Board of Directors at this meeting with such changes as the Company's Chief Executive Officer, Glenn Gibson, may approve;

RESOLVED FURTHER, that the Company's Chief Executive Officer Glenn Gibson is hereby authorized, empowered and directed to take any and all actions as may be necessary or appropriate and to approve the forms, terms or provisions of any agreement or other documents as may be necessary or appropriate, to carry out and effectuate the purpose and intent of the foregoing resolutions; and to delegate in writing to one or more officers or employees of the Company the authority to approve the forms, terms and provisions of, and to execute, any such agreements or documents;

and

RESOLVED FURTHER, that all of the actions of the Company's Chief Executive Officer, Glenn Gibson, which actions would have been authorized by the foregoing resolutions except that such actions were taken prior to the adoption of such resolutions, are hereby severally ratified, confirmed, approved, and adopted as actions on behalf of the Company.

**IN WITNESS WHEREOF,** I have set my hand in the name and on behalf of the Company as of this 27th day of September, 2024.

TD SECURITIES (USA) LLC

By: _____

Suzanne Franco
Secretary

B-2

**BOARD OF DIRECTORS**
**TD GROUP US HOLDINGS LLC**

**BOARD RESOLUTION:**
**CERTIFICATE OF CORPORATE RESOLUTIONS FOR TD GROUP US HOLDINGS LLC**

WHEREAS, TD Group US Holdings LLC ("TDGUS") has been engaged in discussions with the United States Department of Justice, Criminal Division, Fraud Section (the "Fraud Section") regarding issues arising in relation to fraudulent trading in the secondary market for U.S. Treasuries;

WHEREAS, in order to resolve such discussions, it is proposed that TDGUS (on behalf of itself and the Company) agrees to certain terms and obligations of a deferred prosecution among the Company and the Fraud Section (the "Agreement"); and

WHEREAS, TDGUS's General Counsel, Cynthia Adams, together with outside counsel for TDGUS, have advised the Board of Directors of TDGUS of its rights, possible defenses, the Sentencing Guidelines' provisions, and the consequences of agreeing to such terms and obligations of the Agreement among the Company and the Fraud Section;

NOW, THEREFORE, BE IT RESOLVED, that TDGUS (a) acknowledges the filing of the one-count Information charging the Company with 18 United States Code Section 1343; (b) waives indictment on such charge and enters into a deferred prosecution agreement with the Fraud Section; (c) agrees to accept a monetary penalty against the Company totaling $9,414,664, and to pay $3,000,000 of such penalty to the U.S. Postal Service's Consumer Fraud Fund, and to pay the remainder to the U.S. Treasury with respect to the conduct described in the Information; (d) agrees to place into escrow a victim compensation payment in the amount of $4,707,332, to be a distributed by a claims administrator as provided in the Agreement; (e) agrees to pay forfeiture totaling $1,403,906, with credit for up to $400,000 in disgorgement paid to the Securities & Exchange Commission in connection with their parallel resolution, and the remainder paid to the U.S. Postal Inspection Service Consumer Fraud Fund;

RESOLVED FURTHER, that TDGUS accepts the terms and conditions of this Agreement, including, but not limited to, (a) a knowing waiver of the Company's rights to a speedy trial pursuant to the Sixth Amendment to the United States Constitution, Title 18, United States Code, Section 3161, and Federal Rule of Criminal Procedure 48(b); and (b) a knowing waiver for purposes of this Agreement and any charges by the United States arising out of the conduct described in the attached Statement of Facts of any objection with respect to venue and consents to the filing of the Information against the Company, as provided under the terms of this Agreement, in the United States District Court for the District of New Jersey; and (c) a knowing waiver of any defenses based on the statute of limitations for any prosecution relating to the conduct described in the attached Statement of Facts or relating to conduct known to the Fraud

B-1

Section prior to the date on which this Agreement was signed that is not time-barred by the applicable statute of limitations on the date of the signing of this Agreement;

RESOLVED FURTHER, that the General Counsel of TDGUS, Cynthia Adams, is hereby authorized, empowered and directed, on behalf of TDGUS, to execute the Deferred Prosecution Agreement substantially in such form as reviewed by this Board of Directors at this meeting with such changes as the General Counsel of TDGUS, Cynthia Adams, may approve;

RESOLVED FURTHER, that the General Counsel of TDGUS, Cynthia Adams, is hereby authorized, empowered and directed to take any and all actions as may be necessary or appropriate and to approve the forms, terms or provisions of any agreement or other documents as may be necessary or appropriate, to carry out and effectuate the purpose and intent of the foregoing resolutions;

And

RESOLVED FURTHER, that all of the actions of the General Counsel of TDGUS, Cynthia Adams, which actions would have been authorized by the foregoing resolutions except that such actions were taken prior to the adoption of such resolutions, are hereby severally ratified, confirmed, approved, and adopted as actions on behalf of TDGUS.

Date: _September 28, 2024_

By: _____

Yosef Ibrahimi
Assistant Corporate Secretary
TD Group US Holdings LLC

B-2

**ATTACHMENT C**

## CORPORATE COMPLIANCE PROGRAM

In order to address any deficiencies in its internal controls, compliance code, policies, and procedures regarding compliance with the (A) U.S. fraud laws including, but not limited to, the wire fraud statute, Title 18, United States Code, Section 1343; or (B) market manipulation, meaning, conduct which may constitute a violation of (i) the anti-fraud, anti-spoofing, and/or anti-manipulation provisions of the Commodity Exchange Act, Title 7, United States Code, Section 1, et seq.; (ii) the securities and commodities fraud statute, Title 18, United States Code, Section 1348; or (iii) the federal securities laws prohibiting manipulative and deceptive devices, Title 15, United States Code, Sections 78j(b) and 78ff(a), and Title 17, Code of Federal Regulations, Section 240.10b-5 (collectively, "the U.S. Anti-Fraud, Securities and Commodities Laws"), TD Securities (USA) LLC (the "Company") and its corporate parent TD Group US Holdings LLC ("TDGUS") agree to continue to conduct, in a manner consistent with all of their obligations under this Agreement, appropriate reviews of the Company's existing internal controls, policies, and procedures.

Where necessary and appropriate, the Company and TDGUS agree to modify the Company's compliance program, including internal controls, compliance policies, and procedures in order to ensure that the Company maintains a rigorous compliance program that incorporates relevant internal controls, as well as policies and procedures designed to effectively detect and deter violations of the U.S. Anti-Fraud, Securities and Commodities Laws.  At a minimum, this should include, but not be limited to, the following elements to the extent they are

not already part of the Company's existing internal controls, compliance code, policies, and procedures:

*Commitment to Compliance*

1.    The Company will ensure that its directors and senior management provide strong, explicit, and visible support and commitment to compliance with its corporate policy against violations of the U.S. Anti-Fraud, Securities and Commodities Laws, its compliance policies, and its Code of Conduct, and demonstrate rigorous support for compliance principles via their actions and words.

2.    The Company will ensure that mid-level management throughout its organization reinforce leadership's commitment to compliance policies and principles and encourage employees to abide by them. The Company will create and foster a culture of ethics and compliance with the law in their day-to-day operations at all levels of the Company.

*Periodic Risk Assessment and Review*

3.    The Company will implement a risk management process to identify, analyze, and address the individual circumstances of the Company, in particular the fraud and market misconduct risks facing the Company.

4.    On the basis of its periodic risk assessment, the Company shall take appropriate steps to design, implement, or modify each element of its compliance program to reduce the risk of violations of the U.S. Anti-Fraud, Securities and Commodities Laws, its compliance policies, and its Code of Conduct.

C-2

*Policies and Procedures*

5.      The Company will develop and promulgate a clearly articulated and visible corporate policy against violations of the U.S. Anti-Fraud, Securities and Commodities Laws, which shall be memorialized in a written compliance policy or policies.

6.      The Company will develop and promulgate compliance policies and procedures designed to reduce the prospect of violations of the U.S. Anti-Fraud, Securities and Commodities Laws and the Company's compliance policies and Code of Conduct, and the Company will take appropriate measures to encourage and support the observance of ethics and compliance policies and procedures against violation of the U.S. Anti-Fraud, Securities and Commodities Laws by personnel at all levels of the Company.  These compliance policies and procedures shall apply to all directors, officers, and employees and, where necessary and appropriate, outside parties acting on behalf of the Company, including all agents and business partners.  The Company shall notify all employees that compliance with the policies and procedures is the duty of individuals at all levels of the Company.

7.      The Company will ensure that it has a system of financial and accounting procedures, including a system of internal controls and surveillance, reasonably designed to ensure the prevention and detection of violations of the U.S. Anti-Fraud, Securities and Commodities Laws.

8.      The Company shall review its compliance policies and procedures relevant to the U.S. Anti-Fraud, Securities and Commodities Laws as necessary to address changing and emerging risks and update them as appropriate to ensure their continued effectiveness, taking into account relevant developments in the field and evolving international and industry standards.

*Independent, Autonomous, and Empowered Oversight*

9.      The Company will assign responsibility to one or more senior corporate executives of the Company for the implementation and oversight of the Company's compliance policies and procedures relevant to the U.S. Anti-Fraud, Securities and Commodities Laws.  Such corporate official(s) shall have the authority to report directly to independent monitoring bodies, including internal audit, the Company's Board of Directors, or any appropriate committee of the Company's Board of Directors, and shall have an adequate level of autonomy from management as well as sufficient resources, authority, and support from senior leadership to maintain such autonomy.

*Training and Guidance*

10.      The Company will implement mechanisms designed to ensure that its Code of Conduct and compliance policies and procedures relevant to the U.S. Anti-Fraud, Securities and Commodities Laws are effectively communicated to all directors, officers, employees, and, where necessary and appropriate, agents and business partners.  These mechanisms shall include: (a) periodic training for all directors and officers, all employees in positions of leadership or trust, positions that require such training (e.g., internal audit, sales, legal, compliance, finance), or positions that otherwise pose fraud or market-misconduct risk to the Company, and, where necessary and appropriate, agents and business partners; and (b) metrics for measuring knowledge retention and effectiveness of the training.  The Company will conduct training in a manner tailored to the audience's size, sophistication, or subject matter expertise and, where appropriate, will discuss prior compliance incidents.

11.      The Company will maintain, or where necessary establish, an effective system for providing guidance and advice to directors, officers, employees, and, where necessary and

appropriate, agents and business partners, on complying with the Company's compliance policies and procedures relevant to the U.S. Anti-Fraud, Securities and Commodities Laws, including when they need advice on an urgent basis.

*Confidential Reporting Structure and Investigation of Misconduct*

12.     The Company will maintain, or where necessary establish, an effective system for internal and, where possible, confidential reporting by, and protection of, directors, officers, employees, and, where appropriate, agents and business partners concerning violations of the U.S. Anti-Fraud, Securities and Commodities Laws or the Company's Code of Conduct or compliance policies and procedures relevant to the U.S. Anti-Fraud, Securities and Commodities Laws.

13.     The Company will maintain, or where necessary establish, an effective and reliable process with sufficient resources for responding to, investigating, and documenting allegations of violations of the U.S. Anti-Fraud, Securities and Commodities Laws or the Company's compliance policies and procedures relevant to the U.S. Anti-Fraud, Securities and Commodities Laws.

*Compensation Structures and Consequence Management*

14.     The Company will implement clear mechanisms to incentivize behavior amongst all directors, officers, employees, and, where necessary and appropriate, parties acting on behalf of the Company that comply with its corporate policy against violations of the U.S. Anti-Fraud, Securities and Commodities Laws, its compliance policies, and its Code of Conduct. These incentives shall include, but shall not be limited to, the implementation of criteria related to compliance in the Company's compensation and bonus system.

15.     The Company will institute appropriate disciplinary procedures to address, among other things, violations of the U.S. Anti-Fraud, Securities and Commodities Laws and the

Company's Code of Conduct and compliance policies and procedures relevant to the U.S. Anti-Fraud, Securities and Commodities Laws by the Company's directors, officers, and employees. Such procedures should be applied consistently and fairly, regardless of the position held by, or perceived importance of, the director, officer, or employee.  The Company shall implement procedures to ensure that where misconduct is discovered, reasonable steps are taken to remedy the harm resulting from such misconduct, and to ensure that appropriate steps are taken to prevent further similar misconduct, including assessing the internal controls, Code of Conduct, and compliance policies and procedures and making modifications necessary to ensure the overall compliance program is effective.

*Third-Party Management*

16.     The Company will institute appropriate risk-based due diligence and compliance requirements pertaining to the retention and oversight of all agents and business partners, including:

a.      properly documenting due diligence pertaining to the hiring and appropriate and regular oversight of agents and business partners;

b.      informing agents and business partners of the Company's commitment to abiding by the U.S. Anti-Fraud, Securities and Commodities Laws, and of the Company's Code of Conduct and compliance policies and procedures relevant to the U.S. Anti-Fraud, Securities and Commodities Laws; and

c.      seeking a reciprocal commitment from agents and business partners.

17.     Where necessary and appropriate, the Company will include standard provisions in agreements, contracts, and renewals thereof with all agents and business partners that are

C-6

reasonably calculated to prevent violations of the U.S. Anti-Fraud, Securities and Commodities Laws, which may, depending upon the circumstances, include: (a) representations and undertakings relating to compliance with the U.S. Anti-Fraud, Securities and Commodities Laws; (b) rights to conduct audits of the books and records of the agent or business partner to ensure compliance with the foregoing; and (c) rights to terminate an agent or business partner as a result of any breach of the U.S. Anti-Fraud, Securities and Commodities Laws, the Company's Code of Conduct or compliance policies, or procedures, or the representations and undertakings related to such matters.

*Mergers and Acquisitions*

18.     The Company will develop and implement policies and procedures for mergers and acquisitions requiring that the Company conduct appropriate risk-based due diligence on potential new business entities, including appropriate U.S. Anti-Fraud, Securities and Commodities Laws due diligence by legal, accounting, and compliance personnel.

19.     The Company will ensure that the Company's Code of Conduct and compliance policies and procedures regarding the U.S. Anti-Fraud, Securities and Commodities Laws apply as quickly as is practicable to newly acquired businesses or entities merged with the Company and will promptly:

        a.      train the directors, officers, employees, agents, and business partners consistent with Paragraph 10 above on the U.S. Anti-Fraud, Securities and Commodities Laws and the Company's compliance policies and procedures regarding the U.S. Anti-Fraud, Securities and Commodities Laws;

C-7

      b.      where warranted, conduct a U.S. Anti-Fraud, Securities and Commodities Laws specific audit of all newly acquired or merged businesses as quickly as practicable;

      c.      where warranted, establish a plan to integrate the acquired businesses or entities into the Company's enterprise resource planning systems as quickly as practicable.

*Monitoring and Testing*

20.      The Company will conduct periodic reviews and testing of all elements of its compliance program to evaluate and improve their effectiveness in preventing and detecting violations of the U.S. Anti-Fraud, Securities and Commodities Laws and the Company's Code of Conduct and compliance policies and procedures relevant to the U.S. Anti-Fraud, Securities and Commodities Laws, taking into account relevant developments in the field and evolving international and industry standards.

21.      The Company will ensure that compliance and control personnel have sufficient direct or indirect access to relevant sources of data to allow for timely and effective monitoring and/or testing of transactions.

*Analysis and Remediation of Misconduct*

22.      The Company will conduct a root cause analysis of misconduct, including prior misconduct, to identify any systemic issues and/or any control failures. The Company will timely and appropriately remediate the root causes of misconduct. The Company will ensure that root causes, including systemic issues and controls failures, and relevant remediation are shared with management as appropriate.

ATTACHMENT D

**ENHANCED COMPLIANCE REPORTING REQUIREMENTS**

TD Securities (USA) LLC (the "Company") and its corporate parent TD Group US Holdings LLC ("TDGUS") agree that they will report to the United States Department of Justice, Criminal Division, Fraud Section (the "Fraud Section") periodically. During the Term, the Company shall review, test, and update the Company's compliance program and internal controls, policies, and procedures described in Attachment C. The Company shall be required to: (i) conduct an initial ("first") review and submit a first report and (ii) conduct and prepare at least two follow-up reviews and reports, as described below. Prior to conducting each review, the Company shall be required to prepare and submit a workplan for the review. The Company shall also, at no less than three-month intervals during the Term, meet with the Offices regarding remediation, implementation and testing of the Company's compliance program and internal controls, policies, and procedures described in Attachment C. TDGUS will continue to implement a compliance and ethics program at the Company designed to prevent and detect violations of the U.S. Anti-Fraud, Securities and Commodities Laws throughout the Company's operations.

In conducting the reviews, the Company shall undertake the following activities, among others:  (a) inspection of relevant documents, including the Company's current policies, procedures, and training materials concerning compliance with (A) U.S. fraud laws including, but not limited to, the wire fraud statute, Title 18, United States Code, Section 1343; or (B) market manipulation, meaning, conduct which may constitute a violation of (i) the anti-fraud, anti-spoofing, and/or anti-manipulation provisions of the Commodity Exchange Act, Title 7, United States Code, Section 1, et seq.; (ii) the securities and commodities fraud statute, Title 18, United States Code, Section 1348; or (iii) the federal securities laws prohibiting manipulative and

deceptive devices, Title 15, United States Code, Sections 78j(b) and 78ff(a), and Title 17, Code of Federal Regulations, Section 240.10b-5 (collectively, "the U.S. Anti-Fraud, Securities and Commodities Laws"); (b) inspection and testing of the Company's systems procedures, and internal controls, including record-keeping and internal audit procedures at sample sites; (c) meetings with, and interviews of, relevant current and, where appropriate, former directors, officers, employees, business partners, agents, and other persons; and (d) analyses, studies, and, comprehensive testing of the Company's compliance program.

### *Written Work Plans, Reviews and Reports*

1.      The Company shall conduct a first review and prepare a first report, followed by at least two follow-up reviews and reports.

2.       Within sixty (60) calendar days of the date this Agreement is executed, the Company shall, after consultation with the Fraud Section, prepare and submit a written work plan to address the first review.  The Fraud Section shall have thirty (30) calendar days after receipt of the written work plan to provide comments.

3.      With respect to each follow-up review and report, after consultation with the Fraud Section, the Company shall prepare a written work plan within forty-five (45) calendar days of the submission of the prior report, and the Fraud Section shall provide comments within thirty (30) calendar days after receipt of the written work plan.

4.      All written work plans shall identify with reasonable specificity the activities the Company plans to undertake to review and test each element of the Company's compliance program, as described in Attachment C.

5.      Any disputes between the Company and the Fraud Section with respect to any written work plan shall be decided by the Fraud Section in its sole discretion.

6.      No later than one year from the date this Agreement is executed, the Company and TDGUS shall submit to the Fraud Section a written report setting forth: (1) a complete description of the Company's remediation efforts to date; (2) a complete description of the testing conducted to evaluate the effectiveness of the Company's compliance program and the results of that testing; and (3) their proposals to ensure that the Company's compliance program is reasonably designed, implemented, and enforced so that the program is effective in deterring and detecting violations of the U.S. Anti-Fraud, Securities and Commodities Laws.  The report shall be transmitted to:

> Deputy Chief –MIMF Unit
> Deputy Chief – CECP Unit
> Criminal Division, Fraud Section
> United States Department of Justice
> 1400 New York Avenue N.W.
> Washington, D.C. 20005

The Company may extend the time period for issuance of the first report with prior written approval of the Fraud Section.

### *Follow-up Reviews and Reports*

7.      The Company shall undertake at least two follow-up reviews and reports, incorporating the views of the Fraud Section on their prior reviews and reports, to further monitor and assess whether the Company's compliance program is reasonably designed, implemented, and enforced so that it is effective at deterring and detecting violations of the U.S. Anti-Fraud, Securities and Commodities Laws.

8.      The first follow-up ("second") review and report shall be completed by no later than one year after the first report is submitted to the Fraud Section.

9.      The second follow-up ("third") report shall be completed and delivered to the Fraud Section no later than thirty (30) days before the end of the Term.

10.     The Company and TDGUS may extend the time period for submission of any of the follow-up reports with prior written approval of the Fraud Section.

### *Meetings During the Term*

11.     The Company and TDGUS shall meet with the Fraud Section within thirty (30) calendar days after providing each report to the Fraud Section to discuss the report.

12.     At least quarterly, and more frequently if the Fraud Section deems it appropriate in its sole discretion, representatives from the Company, TDGUS and the Fraud Section will meet to discuss the status of the review and enhanced self-reporting obligations, and any suggestions, comments, or improvements the Company and TDGUS may wish to discuss with or propose to the Fraud Section.

### *Confidentiality of Submissions*

13.     Submissions by the Company and TDGUS, including the work plans and reports, will likely include proprietary, financial, confidential, and competitive business information. Moreover, public disclosure of the submissions could discourage cooperation, impede pending or potential government investigations and thus undermine the objectives of the reporting requirement.  For these reasons, among others, the submissions and the contents thereof are intended to remain and shall remain non-public, except as otherwise agreed to by the parties in writing, or except to the extent the Fraud Section determines in its sole discretion that disclosure would be in furtherance of the Fraud Section's discharge of its duties and responsibilities or is otherwise required by law.

**ATTACHMENT E**

**CERTIFICATION**

To:    United States Department of Justice
       Criminal Division, Fraud Section
       Attention:  Chief of the Fraud Section


Re:      Deferred Prosecution Agreement Disclosure Certification

The undersigned certify, pursuant to Paragraph 26 of the deferred prosecution agreement

("the Agreement") filed on September 30, 2024 in the United States District Court for the District

of New Jersey, by and between the United States of America and TD Securities (USA) LLC (the

"Company"), that undersigned are aware of the Company's and TD Group US Holdings LLC's

("TDGUS") disclosure obligations under Paragraph 6 of the Agreement, and that the Company

and TDGUS have disclosed to the United States Department of Justice, Criminal Division, Fraud

Section (the "Fraud Section") any and all evidence or allegations of conduct required pursuant to

Paragraph 6 of the Agreement, which includes evidence or allegations of any violation of (A) U.S.

fraud laws including, but not limited to, the wire fraud statute, Title 18, United States Code, Section

1343; or (B) market manipulation, meaning, conduct which may constitute a violation of (i) the

anti-fraud, anti-spoofing, and/or anti-manipulation provisions of the Commodity Exchange Act,

Title 7, United States Code, Section 1, et seq.; (ii) the securities and commodities fraud statute,

Title 18, United States Code, Section 1348; or (iii) the federal securities laws prohibiting

manipulative and deceptive devices, Title 15, United States Code, Sections 78j(b) and 78ff(a), and

Title 17, Code of Federal Regulations, Section 240.10b-5, committed by the Company

("Disclosable Information").  This obligation to disclose information extends to any and all

E-2

Disclosable Information that has been identified through the Company's and TDGUS's compliance and controls program, whistleblower channel, internal audit reports, due diligence procedures, investigation process, or other processes.  The undersigned further acknowledge and agree that the reporting requirements contained in Paragraph 6 and the representations contained in this certification constitute a significant and important component of the Agreement and of the Offices' determination whether the Company and TDGUS have satisfied their obligations under the Agreement.

The undersigned hereby certify that they are the Chief Executive Officer and the Chief Financial Officer of the Company and Chief Executive Officer and Chief Financial Officer of TDGUS, respectively, and that each has been duly authorized by the Company and TDGUS to sign this Certification on behalf of the Company and TDGUS.

This Certification shall constitute a material statement and representation by the undersigned and by, on behalf of, and for the benefit of, the Company to the executive branch of the United States for purposes of 18 U.S.C. § 1001, and such material statement and representation shall be deemed to have been made in District of New Jersey.  This Certification shall also constitute a record, document, or tangible object in connection with a matter within the jurisdiction of a department and agency of the United States for purposes of 18 U.S.C. § 1519, and such record, document, or tangible object shall be deemed to have been made in the District of New Jersey.

Date: _____    Name (Printed): _____

Name (Signed): _____
Chief Executive Officer
TD Securities (USA) LLC

E-2

Date: _____    Name (Printed): _____

                                  Name (Signed): _____
                                  Chief Financial Officer
                                  TD Securities (USA) LLC

Date: _____    Name (Printed): _____

                                  Name (Signed): _____
                                  Chief Executive Officer
                                  TD Group US Holdings LLC

Date: _____    Name (Printed): _____

                                  Name (Signed): _____
                                  Chief Financial Officer
                                  TD Group US Holdings LLC

ATTACHMENT F

## **COMPLIANCE CERTIFICATION**

To:     United States Department of Justice
         Criminal Division, Fraud Section
         Attention:  Chief of the Fraud Section


Re:     Deferred Prosecution Agreement Compliance Certification

The undersigned certify, pursuant to Paragraph 19 of the Deferred Prosecution Agreement filed on September 30, 2024, in the United States District Court for the District of New Jersey, by and between the United States of America and TD Securities (USA) LLC (the "Company") (the "Agreement"), that the undersigned are aware of the Company's compliance obligations under Paragraphs 16 and 17 of the Agreement, and that, based on a review of the Company's reports submitted to the Department of Justice, Criminal Division, Fraud Section pursuant to Paragraph 18 of the Agreement, the reports are true, accurate, and complete.

In addition, the undersigned certify that, based on the undersigned's review and understanding of the Company's compliance program to address (A) U.S. fraud laws including, but not limited to, the wire fraud statute, Title 18, United States Code, Section 1343; or (B) market manipulation, meaning, conduct which may constitute a violation of (i) the anti-fraud, anti-spoofing, and/or anti-manipulation provisions of the Commodity Exchange Act, Title 7, United States Code, Section 1, et seq.; (ii) the securities and commodities fraud statute, Title 18, United States Code, Section 1348; or (iii) the federal securities laws prohibiting manipulative and deceptive devices, Title 15, United States Code, Sections 78j(b) and 78ff(a), and Title 17, Code of Federal Regulations, Section 240.10b-5 (collectively, "the U.S. Anti-Fraud, Securities and Commodities Laws"), the Company has implemented a compliance program that meets the requirements set forth in Attachment C to the Agreement.  The undersigned certifies that such

compliance program is reasonably designed to detect and prevent violations of the U.S. Anti-Fraud, Securities and Commodities Laws throughout the Company's operations.

The undersigned hereby certify that they are respectively the Chief Executive Officer of the Company and the Chief Compliance Officer of the Company and the Chief Executive Officer and Chief Compliance Officer of TD Group US Holdings LLC ("TDGUS") and that each has been duly authorized by the Company and TDGUS, respectively, to sign this Certification on behalf of the Company and TDGUS.

This Certification shall constitute a material statement and representation by the undersigned and by, on behalf of, and for the benefit of, the Company and TDGUS to the executive branch of the United States for purposes of 18 U.S.C. § 1001, and such material statement and representation shall be deemed to have been made in the District of New Jersey. This Certification shall also constitute a record, document, or tangible object in connection with a matter within the jurisdiction of a department and agency of the United States for purposes of 18 U.S.C. § 1519, and such record, document, or tangible object shall be deemed to have been made in the District of New Jersey.

Date: _____    Name (Printed): _____

                                Name (Signed): _____
                                Chief Executive Officer
                                TD Securities (USA) LLC

Date: _____    Name (Printed): _____

                                Name (Signed): _____
                                Chief Compliance Officer
                                TD Securities (USA) LLC

Date: _____    Name (Printed): _____


                                 Name (Signed): _____
                                 Chief Executive Officer
                                 TD Group US Holdings LLC


Date: _____    Name (Printed): _____


                                 Name (Signed): _____
                                 Chief Compliance Officer
                                 TD Group US Holdings LLC